## CARLETON & CO. v. BANKS.

1. An act of the Legislature authorizing a married woman to act and dispose of all property subsequently acquired by her, by her own exertions, or from other persons, as a *feme sole*, with a saving as to existing creditors, will not have a retrospective effect, so as to deprive the husband or his creditors of the benefit of any property which previously belonged to the wife.

2. Previous to marriage a deed was executed conveying to a trustee a slave, and securing to the female a life interest therein, with remainder to others. The trustee delivered the slave to the female, who either before or after such delivery married. *Held*—that the life estate was subject to sale, under execution, by the creditors of the husband, notwithstanding the act previously cited ; and that it was unimportant whether the possession was delivered before or after the passage of this act.

3. Whether the sale would affect the right of survivorship, *quere?*

Error to the Circuit Court of Tuscaloosa County.

THE plaintiffs in error having obtained a judgment against Francis Hatfield and others, sued out their execution and levied it on a slave as the property of Hatfield, which was claimed by the defendant in error as trustee, and the proceedings in the Court below were had to try the right of property. The claimant relied on a deed made on the 4th May, 1832, between William Dunlap of the first part, Willis Banks (the claimant) of the second part, and Harriet Smith of the third. The deed conveys two slaves to the party of the second part, upon the trust that "he will permit the party of the third part to have and retain possession of the slaves and their increase, and to receive and enjoy the profits thereof, for and during the

term of her natural life, and at her death, said negro girls, with their increase, to descend to the issue of her body; and in the event that she dies without issue, then said negro girls and their increase, to descend to Nancy Smith, mother of said Harriet, and to the children of said Nancy." The deed contains a covenant that the trustee will convey to those in remainder, on the death of the party of the second part without issue. The complainant also read to the jury an act for the relief of Harriet Hatfield, passed 14th December, 1841, and proved that Harriet Smith, named in the deed, married Francis Hatfield, and that the slave levied on is one of the slaves mentioned in the deed.

It was proved that the slave was in the possession of Hatfield and wife, at the time of the levy, and for some time before, but the proof was not clear or conclusive as to the time when it went into their possession.

The Court charged the jury, that if the slave went into the possession of Harriet before the passage of the act for her relief, and was so in possession after her intermarriage with Hatfield, then the interests of Hatfield in the slave was liable to the execution. But, that if the slave was not in their possession until after the passage of the act, then the possession would be her possession, and not subject to the execution against Hatfield. To the last charge the plaintiff excepted, and asked the Court to charge the jury that in the absence of proof the presumption from the deed would be that the *cestui que use* went into possession under the deed, which the Court refused, and the plaintiff excepted.

The assignment of error brings to view the propriety of the charge given, and that refused.

CRABB, for plaintiff in error.

PECK & CLARKE, contra.

ORMOND, J.—The act of the Legislature passed for the benefit of Mrs. Hatfield is to the following effect: " That from and after the passage of this act, it shall be lawful for Harriet Hatfield, of the county of Marengo, to take, receive and hold by purchase, gift or inheritance, any property, either real or personal, free from the hindrance, molestation, control or au-

thority of her husband, Francis Hatfield, and the same to dispose of by will, gift or sale, in the same manner as if she were a *feme sole : Provided,* the provisions of this act shall apply only to such property as she shall acquire by her own exertions, or from other persons, and shall not operate to the prejudice of existing creditors, as to property heretofore acquired."

It is very certain that it was not intended by the Legislature that this act should have a retrospective operation, it cannot therefore have any effect upon any right of the husband or his creditors, which existed anterior to this act. The right, whatever its character may be, which was conveyed by the deed to Mrs. Hatfield, existed many years previous to the passage of the act, and was by the marriage, and subsequent reduction into possession, vested in the husband; the Court, therefore, erred in supposing that if possession of the slaves have not been taken by the husband and wife, until after the passage of the. act, it would not enure to the benefit of the husband. The possession when taken, must be referred to the authority under which it was taken, and as that existed long. anterior to the passage of this act, it is not affected by it. The question whether the slaves came to the possession of the husband and wife before or after the passage of the act was unimportant; and it is not necessary to consider the propriety of the refusal of the Court to charge upon the presumption of possession, insisted on by the plaintiff. It is, however, contended, that conceding that the Court erred in its charge to the jury, yet as the right of the wife was a mere equitable interest, it was not the subject of sale by execution at law, and could only be reached by the creditor on application to a Court of Chancery.

Marriage is, in law, a gift to the husband of all the personal property of the wife, in which she has an actual or beneficial interest. If in possession, it vests immediately upon the marriage. If it be a *chose in action,* it must be reduced to the possession of the husband during the coverture, or it will survive to the wife on the death of the husband. If the interest of the wife be equitable in its nature, and to reduce it into possession, it is necessary to resort to a Court of Chancery, that Court will refuse its aid, unless the husband makes a suitable provision for her out of the fund sought to be recovered. [Bond

v. Simmons, 3 Atkins, 20 ; Langhorne v. Nanny, 3 Vesey 469 ; see the general doctrine, 2 Story's Eq. 634, § 1406, and Roper on Husband and Wife, 256.] .

In England, the wife's personal *chose in action* consists, usually, of either money in the hands of another, or stocks, and in such cases it is perfectly clear, that the husband, after having reduced it into possession, acquires full dominion over it. The estate of the wife in this case, being the *usufruct* of the slaves during her life, is supposed in argument to present a different case. In our opinion there is no difference whatever between them as to the question now before the Court. If the wife's *chose in action* is money in the hands of a trustee : as for example, a legacy ; or, if it be a security for the payment of an annual sum, as an annuity, or a certificate of stock or Bank shares ; in either case, upon a reduction into possession, the husband is invested with full dominion over it; because his title to it is the same as would be that of his wife in possession, if she had remained sole. In this case it is true the interest of the wife in the slaves is for life only, but that interest is as absolute and unqualified, as if it were for the life of the slave. Her right to the possession and services of the slave is subject to no contingency, nor to the control of any other person. The trustee in whom the legal title is vested for the purpose of the remainder, has no more right to disturb her possession than a stranger. If he had refused to deliver the possession according to the stipulations of the deed, he could by suit, either by the wife before marriage; or by the husband afterwards, have been compelled to deliver it, after which he would be *estopped* by his own deed, from asserting any right to, or disturbance of the possession.

The case of a leasehold estate belonging to the wife, appears to furnish the closest analogy to this of any we can find in the English books, and it appears to be settled, that the husband may assign it, and that whether the estate be legal or equitable, the assignee will take it discharged from the equity of the wife. [Bates v. Dandy, 2 Atkins 207 ; Druce v. Dennison, 6 Vesey, 385; Shannon v. Bradstreet, 2 S. & Lefroy, 52 ; 2 Story Com. on Eq. 636, § 1410.

Again, it appears there is a difference between an absolute equitable interest in the wife, and an interest for life only.

Carleton & Co. v. Banks.

Thus, in Stanton v. Hale, 2 Russ. & M. 175, it was held, that a married woman could not, as against the assignee of the husband, claim a settlement out of an annuity for life bequeathed to her, the husband having afterwards become insolvent. The same doctrine was asserted in Elliott v. Cordell, 5 Madd. 149.

It must be kept in mind that the principle we have been considering is applicable only, when the husband or his assignee are endeavoring, by the aid of a Court of Chancery, to get possession of an equitable *chose in action* of the wife. If it be *legal* in its nature, so that the husband or his assignee is not compelled to seek the aid of Chancery to obtain the possession, the equity of the wife to a settlement does not arise. Indeed the equity of the wife has no existence, but in the power of the Chancellor to refuse his aid, unless a provision is made for the wife. In this case, however, the trustee yielded the possession, and it is therefore entirely unimportant whether the interest thus reduced into possession, was legal or equitable; in either case, after such reduction by the husband *into possession, it becomes his property to the full extent of the interests of his wife.*

It is very clear that the effect, as it respects the husband's right to the thing, must be the same, whether he obtains possession of it by suit, or by the voluntary delivery of the person in possession. If in the case of an equitable *chose in action*, the trustee chooses, without suit, to put the husband in possession, the equity of the wife to a settlement would be gone. In Murray v. Lord Ellibank, 10 Vesey, 89, Lord.Eldon, speaking of an equitable *chose in action*, says, "The husband where he can, is entitled to lay hold of his wife's property, and this Court will not interfere. Previously to a bill filed, a trustee who has the wife's property, real or personal, may pay the rents and profits, and may hand over the personal estate to the husband." It is therefore, perfectly clear, that by this reduction into possession, in this case, the husband acquired all the interest which his wife had in the slaves, and it is entirely unimportant whether they came to the possession of the wife before marriage, or were reduced to possession by the husband afterwards. What is this interest? It is an estate for the life of the wife, in the slaves in controversy. This

is a chattel; it is a certain definite, tangible thing; is suscep-
tible of transfer and sale, and may therefore be levied on and
sold by execution. How does this differ from any other sim-
ilar interest of the wife? Suppose a woman at her marriage
to be the heir of a slave for an unexpired time, it cannot be
questioned that such an interest would vest in the husband,
and might be sold by execution for the payment of his debts;
notwithstanding the legal title was outstanding in another.
If Mrs. Hatfield had remained *sole*, can it be questioned that
she could have sold her life interest, or that it would be liable
for the payment of her debts? Yet the interest of the husband
in possession, is precisely the interest which the wife had be-
fore marriage. Whether a voluntary sale by the husband,
or a sale made under execution by his creditors, would affect
the wife's right of survivorship, should she outlive her hus-
band, is a question we are not called on to determine; it is
certain it could not affect the interest of those in remainder.

The result of our examination is, that this was such an in-
terest as was the subject of sale by execution, if reduced to
possession by the husband, and the Court erred in supposing
that the act of 14th December, 1841, was intended to affect
the right of the husband to the interest of the wife in the
slaves in controversy.

Let the judgment be reversed and the cause remanded.

GOLDTHWAITE, J.—I dissent from the opinion deliver-
ed by Judge ORMOND, because I think this a very clear case for
Mr. Banks on the question of title.

It seems to me, whatever may be the equities of Mrs. and
Mr. H. under the deed of trust executed by Mrs. Smith, that
Banks was thereby invested with the legal title to the slave in
controversy, and that it must remain in him until the complete
execution of the trust, unless he is removed by competent
authority.

But it is said, the possession of the slave by H. after mar-
riage, constitutes a legal title, which is subject to execution, the
more especially, as the trust, or use, will be considered as ex-
ecuted, so far as the life estate of Mrs. H. is concerned, by
the delivery of it to her or her husband pursuant to the deed.
This argument demands consideration, for upon it, as it seems
to me, the decision of the Court is based.

I concede that the possession of a chattel invests the possessor with a legal title, which *prima facie* is subject to execution. It is on this idea that our decisions rest, that the estate of the mortgagor, &c. in chattels, may be seized and sold, when he remains in possession previous to the law day; but this concession will not warrant the conclusion that the sheriff can hold the chattel against one who is invested with, or has a better legal title. Even with respect to mortgages and deeds of trust, we have held that where the levy was before the law day, and a demand of the sheriff was made after it, that he was liable to the mortgagor or trustee for a conversion. [Magee v. Carpenter, 4, Ala. Rep. 469.] This, I believe, is not controverted, and therefore the right of the execution creditor of H. must rest on the supposition, either that Banks never had the legal title, or, if he had, that it was *ipso facto* extinguished for the lifetime of Mrs. H., so soon as she was permitted to have the use of the slave; a permission which Banks was bound to accord, and which a Court of equity would have compelled. In Lewis v. Adams, 6 Leigh. 320, a father executed a deed, conveying slaves to a third person " in trust for his daughter and all her children." The slaves were delivered into the husband's possession, and afterwards levied on by a creditor. The objection was taken that this was not a trust estate, inasmuch as the trustee had no duties to perform; but the Court held otherwise. In Virginia, I infer from one reference made by Judge Tucker, in the case of Roane v. Archer, 4 Leigh. 550, 568, there is a statute which allows the sale, under execution, of trust estates in possession of the *cestuis que trust;* yet there it was determined that the trustee might sue the sheriff who had sold slaves conveyed to the wife and husband during their joint lives, and the remainder to their children. These cases, in my judgment, prove clearly that the legal title to the slave in controversy was in Banks by the execution of the deed; and also, that his title was in no way affected by allowing Hatfield and wife to have the possession. I may also add, that it is laid down by elementary writers, that a use may be created of a chattel as well of lands. [Lewin on Trusts, 4.] And further, that if this deed is to be construed as passing the title directly from Mrs. Smith to her daughter, it, by the common law rule, would invest the

whole title, as by that no estate in remainder, of a personal chattel, can be created by deed. [3 Black Comm., 398.] It is equity which allows a remainder, either contingent or vested, to be made by a conveyance in trust. [Hargraves note, 5 Coke Litt. 20 a. 3 vol. note, 120.] Unless the legal estate remains in Banks he cannot, after the determination of the life estate of Mrs. H. place the slave in the possession of the person entitled to the remainder, without a trespass upon the rights of some one having the legal title. These reasons and decisions are perfectly satisfactory to my mind that Banks has the legal title to the slave; and, if this is true, I presume it will not be disputed that he may sue at law any one who intermeddles with it; and that a Court of law cannot for any purpose whatever, recognize the title of the *cestui que trust.* [Lewin on trusts, 20.]

The fact that the legal title is in Banks, would of itself be sufficient, in my opinion, to save the judgment from reversal; but as this point merely settles that the creditor cannot pursue the life interest of Mrs. H. at law, I am willing to concede it is of little value if the creditor has the right to subject her interest to the payment of this debt in any form; if he is entitled to sell her life estate without any qualification, it is of little importance whether he does it under execution at law, or by direction of a Court of equity. Indeed, in all cases, the leaning of my mind is to get at the result, when it is to be the same in either Court, as speedily and as cheaply as possible.

But I think there is no case, in which a creditor can at law pursue the equitable estate of the wife for the satisfaction of a debt due from her husband. It has been held by very high authority that a creditor, as such, cannot go into equity to subject either the *choses in action*, or equitable estate of the wife. [Gallego v. Gallego, 2 Brock. 285.] Waiving the distinction between a creditor, as such, or the assignee under a decree of bankruptcy or insolvency, and considering both to have the same rights, I shall consider what are the rights of the wife with respect to an estate held for her use by the intervention of a trustee; and I also lay out of view the value of property, inasmuch as I presume there is no such rule recognized in this country, as obtains in the English Equity Courts, where two

hundred pounds is said to be the minimum of jurisdiction. [Foder v. Finney, 4 Russ. 428.]

By the common law, marriage is a gift by the wife of all the personal chattels which she has in possession, and of all the choses in action to which she is entitled, if the husband shall reduce them to possession during the coverture. In relation to equitable estates, as the common law knew nothing about them, it was silent; and Courts of equity, looking beyond the mere arbitrary rule to its reason, have, by a gradual course of decisions built up a system to govern the equitable estates belonging to married women, which is termed the wife's equity. Some eminent jurists have thought it not easy to ascertain the precise origin of this right of the wife, or the precise grounds on which it was first established. [Murray v. Elibank, 10 Vesey, 90; 13 Ib. 6; 2 Story's Eq. 635, § 1407.] But others, with more propriety, in my opinion, refer the jurisdiction to the reason which induced the common law to give the husband the wife's property. [Elliott v. Cordell, 5 Madd. 155.] This reason is, that the husband is bound to support and maintain his wife, therefore as long as he does so, a Court of Equity will allow him to receive the income of his wife's equitable estate. [2 Story Eq. 642, § 1415.] But, in general, he will not be permitted to receive the principal, nor to assign it to a purchaser, even for a valuable consideration; nor will his assignee in bankruptcy or insolvency, take it discharged from the wife's equity. He, and any one claiming under him, will be compelled to make an adequate settlement upon the wife and her children before receiving the principal sum. [2 Story on Eq. 639, and cases there cited, 641, § 1412, 1414; Kenny v. Udall, 5 John. Ch. 473, S. C. 3 Cow. 590; Elliott & Wife v. Waring, 5 Mon. 340; Bennett & Wife v. Dillingham, 2 Dana, 437.] So far is the future maintenance of the wife looked to in England, that there the husband will neither be permitted to sell his wife's reversionary interest in an equitable estate, although she join in the sale. [Purdew v. Jackson, 1 Russ. 1; Horner v. Morton; 3 Ib. 65.] Nor will the Court permit it to be conveyed to the husband absolutely, though she join in the petition. [Stiffe v. Everett, 1 Mylne, &c. 37.] The wife's equitable estate in a term of years, is an exception to this rule, created by the House of Lords, against the opinion of the Chancellor.

[Sir Edward Turner's case, 2 Vern. 7.]   But then, and since, disapproved, though followed.   [Tudor v. Smayne, 2 Vern. Rep. 270.]   Another apparent exception, that the husband *when solvent and maintaining his wife* may sell, *bona fide,* his wife's equitable estate for life, is settled by the cases of Elliott v. Cordell, 5 Madd. 155, and Stanton v. Hall, 2 Russ. & M. 175—though even in these it is distinctly admitted that if the husband was bankrupt or insolvent the wife's equity would attach to the general assignee.   In Virginia, it has been directly determined that a creditor could not pursue slaves settled by deed of trust on the wife and husband for their joint uses, with remainder to their children.   [Roane v. Archer, 4 Leigh. 550; Scott v. Gibson, 5 Munf. 569.]   The effect of the cases of Elliott v. Cordell and Stanton v. Hall, in my judgment, is greatly misapprehended, if they are supposed to sustain the opinion of the Court; for they establish nothing farther than that the wife, whose equitable estate in personal chattels has been sold by her husband, at a time when he was solvent and maintaining her, has no equity during the life of her husband against the purchaser.   That they do not touch or impair the general rule, or even the wife's right of survivorship, is evident, from the more recent case of Stiffe v. Everett, 1 Mylne, &c.   There the wife joined her husband in a petition to have her life interest in some funds transferred absolutely to him; but the Master of the Rolls (see C. C. Pepey's) denied the application, and said, he doubted the right of the husband, even with the wife's consent, to dispose of her entire life estate, inasmuch as she might outlive her husband; in which event that part of *the estate to be enjoyed after his death* would be reversionary only.   The same individual afterwards, when Lord Chancellor, reheard the cause, when he said no cases had been produced to support the petition, and he believed it certain that none could be found, as such a notion was in direct opposition to the decisions in Perdew v. Jackson and Horner v. Morton, 1 Russ. 1; 3 Ib. 65.   This determination certainly never would have been made, if it then had been supposed, the husband was entitled absolutely to sell his wife's reversionary interest in her equitable life estate.   Chancellor Kent has carried the idea of the wife's equity so far as enjoin a creditor from selling the husband's estate by curtesy in lands

6

of his wife, when she had been abandoned by him. [Haviland v. Bloom, 6 John. C. 117.] It is true, in this case there was a divorce a *mensa et thora*, but, he says, the wife's equity, independent of that circumstance, would warrant the relief.

I am not prepared to say how far the wife's equity ought t o be sustained here; but certainly it must be conceded that under peculiar circumstances she has it not only against her husband, but against any one claiming under him. This right o f the wife is incapable of examination or of adjustment in a court of law; and therefore, a creditor seeking to charge the equitable estate of the wife, in my opinion, must resort to a Court of equity. My judgment also leads me to the conclu – sion, that neither Hatfield or his wife have any legal estate in the slave in controversy, which can be successfully used by his creditor, to defeat the claim of the trustee, under the deed of Mrs. Smith.