## TERRELL, ET ALS. V. GREEN, ET ALS.

1. A conveyance being made of land and slaves, to a husband in trust for his wife and children, his possession of the property will be referred to the deed, and that he holds it as trustee merely, unless he does some act, demonstrating his intention to assert his marital rights over it. If he dies without manifesting such intention, and before any creditor has in his name asserted such right, the interest of the wife in the property will survive to her.

2. Signs or badges of fraud are repelled, by showing that a full consideration was paid for the property, but the proof of fairness would be more stringent, than if such badges of fraud did not exist.

Error to the Chancery Court of Montgomery.

THE bill was filed by the plaintiffs in error, judgment creditors of John S. Green. It charges that whilst the suits were pending in Hancock county, Georgia, in the year 1828, John S. Green left Hancock county clandestinely, and came to Alabama, bringing with him a number of slaves and other personal property then belonging to him. That shortly before his removal, or soon after his arrival in Alabama, John S. Green fraudulently transferred his property to his brother, Joseph A. Green, in trust for his wife and children.

That they instituted suits against J. S. Green, in the circuit court of Montgomery in this State, and recovered judgments against him, founded upon the judgments obtained in Georgia, upon which execution has issued, and been returned no property found.

That in the year 1835, Joseph A. Green conveyed by deed to John S. Green, twenty-two slaves, in trust for the use of his wife and children, which they insist conveyed a joint and undivided title to the slaves to him and his children. That they are the same slaves removed from the State of Georgia, or others bought from the proceeds of their sale. That in the year 1837, John S. Green died, and Joseph A. Green be-

came his administrator and the guardian of his children, and has reported the estate insolvent.

That Lucy, the widow of John S., and Joseph A. Green as guardian on the death of John S., took possession of the slaves mentioned in the deed, and have retained possession ever since, deriving large profits therefrom, &c. but refuse to pay the just debts of John S. Green. The prayer of the bill is, that the deed of trust be declared fraudulent and void— that the slaves be sold for the payment of their debts, and for general relief, &c. The deed of trust is appended to the bill as an exhibit. The bill was filed in March, 1843.

An amended bill charges, that before the negroes were re-moved from the State of Georgia, John A. Green, upon some pretended consideration, executed to Joseph A. Green, a bill of sale for the whole or most of the slaves. That John S. was then in great pecuniary difficulties, and in making the conveyance intended to evade the payment of the debts then due by him, or to place the slaves beyond the reach of the executions then issued, or to be thereafter issued. That Jo-seph A. Green, or Thornton Talliaferro, his agent, then knew, or had good reason to believe, that the condition of Joseph A. was as stated, and his motive such as here set forth, and further charges, that there was a secret agreement between the parties, that the slaves should be held in some way for the benefit of John S. Green, and his family. That at the time of the conveyance, there were unsatisfied judgments of complainants, and others, which, by the statute law of Geor-gia, were a lien on the slaves.

The bill proceeds to state other facts, indicating fraud— as that the slaves were removed to Alabama in a very short time after the sale, in the night, and secretly, on the Sabbath, travelling unfrequented and circuitous paths. That John S. came to Alabama with the slaves, and resided on, or near the plantation, and so continued to reside until his death, &c. That for three years previous to the date of the deed of trust, John S., or his family, had the possession or benefit of the slaves, and that he or his family, were supported from the labor of the slaves, with the privity of Joseph A. Green. The bill further charges, the purchase of a tract of land by John S. Green, with his own money, and the title taken in

Terrell, et als. v. Green, et als.

the name of Joseph A. for the purpose of defrauding the creditors of John S.

The bill further charges, that the sale of the slaves was made to secure a debt due by John S. to Joseph A., and being executed in the State of Georgia, was within the meaning and influence of a statute of that State, which declares such transfers of property fraudulent and void, as against the creditors of the grantor.

Joseph A. Green answered the bill, and denied all the material allegations. He sets up a purchase of the slaves from his brother, in payment of a debt due from him, secured by four promissory notes, which he makes an exhibit, they having been found by his brother's widow, after his death, among his papers. The purchase money of the twenty slaves being $4,519, which he says was a full and fair price for them. The residue beyond the notes held by him on John S., being paid in cash, at the time. He positively denies any fraudulent intent in the purchase—denies knowing that his brother was seriously embarrassed, but supposed he was perfectly solvent. That he received possession immediately, and employed an agent to bring the slaves to this State, where he was about removing. That when they reached here, they went into his possession, and there remained until the 11th August, 1835, when he conveyed them by a trust deed, since which time they have been in the possession of John S. and his family. That having been very successful in plainting, and improving lands, with the slaves purchased from his brother, and he being in bad health, from the love and affection he had for him and his family, he made the conveyance to them.

He denies the secrecy imputed to him in bringing out the slaves; that the trade was concluded on Monday, and he told his agent to set out immediately, and take the usual road and he presumes he did so. The agent has been long since dead. In reference to the land, he denies all the allegations of the bill, and says it was purchased by Mrs. Ware, the mother of John S., and himself, for a home for the wife and children of John S., and for their sole and separate use. He relies upon the laches of the complainant, and pleads the sta-

27

tute of limitations as a bar to any relief, and also relies on the statute of non-claim.

The widow of the deceased, and Merrill, her present husband, answer, adopting the answer of Joseph A. Green in all respects. The children, by their guardian *ad litem*, answer, and call for proof of all the allegations of the bill.

Much testimony was taken, which, so far as it is pertinent, is noticed in the opinion of the court.

The chancellor considered the fraud in the sale of the slaves as sufficiently established, but refused relief, because of the staleness of the demand; and of the statute of limitations set up by way of plea.

The assignments of error, present for revision the entire case made by the bill and answers.

Cocke, for plaintiff in error.

T. Williams and McLester, contra.

ORMOND, J.—The first inquiry which presents itself is, what is the character of the sale made by John S. Green, to his brother Joseph A. Green. The bill charges it to be fraudulent. That John being greatly embarrassed, with judgments about to be obtained against him, made a pretended sale of the slaves to his brother, who held them in trust for him, and finally reconveyed them to him and his family.

The defence is, that it was a *bona fide* purchase of the slaves for their full value ; that there was no trust, either express or implied, that the slaves should be held for John S. Green, or his family ; and that they were finally reconveyed to the family of John S. as a gift, without any other consideration, than that of love and affection.

The most material inquiry is, as to the consideration, for if that was really paid, and was a fair price for the slaves, it neutralizes most of the facts relied upon as badges of fraud. The defendant, Joseph A. Green, whose answer upon this point is strictly responsive to the allegations of the bill, is evidence for him. He denies all intention of defrauding any one ; denies that he knew his brother was insolvent, and circumstantially relates every thing connected with the purchase. He states that he lived some sixty miles distant from his bro-

ther John, who was indebted to him about $4,500, for which he held his notes. That in the fall of 1828, intending to purchase land in Alabama, he called on his brother to get his money, but failed to obtain it. That he came to this State and purchased land, and on his return again called on his brother, who being unable to pay, agreed to let him have slaves at valuation. That he took them at the appraised value, and took a bill of sale of them. That he then employed an agent, (Thornton Talliaferro,) now dead, to carry them to his plantation in Alabama, he returning to his house in Georgia. That they remained in his possession, until by their labor they had realized what he paid for them, when he made a free gift of them to his brother's family, he being poor and in bad health.

This transaction, so far as it relates to the consideration, and the circumstances attending the sale, is fully sustained by W. G. Green, who was examined by the complainants. He proves that John was indebted to his brother Joseph, for which the latter held his notes. That in the fall of 1828, these notes were sent to him for collection by his brother, in anticipation of his visit to Alabama to purchase land. That on his way to this State he called for his money, but could not get it, and on his return from this State, having purchased land, again insisted on payment, offering to take property. This offer resulted in his taking the negroes, at the value assessed upon them by the three brothers. He knows of no trust, either express or implied. He further states that Thor. Talliaferro, their brother-in-law, was not present when the valuation was made, but coming in afterwards, said the appraisement was too low, and thereupon Joseph agreed to pay, and did pay, John $500 more, making the purchase money $5,000. This fact, which, coming from the plaintiff's own witness, cannot be questioned by him, and is doubtless true, stamps the true character of this transaction, and shows it to have been a real, and not a sham sale, for the purpose of defrauding creditors.

The same facts are also established by Benjamin Cook, the father-in-law of John S. Green. He also gives a list of the slaves, with the estimated value of each, many of them being young children, and says the price given for the slaves

was more than they would have sold for at the the time, as negroes were then very low, a fact which this court knows as matter of history. These witnesses prove also, that the notes held by Joseph, on John Green, were given up to him at the time, and these notes are appended to the answer of Joseph Green, having been handed to him, as he says, by the widow of John Green, after his death. They bear date in 1824, 1825, and 1827, and purport to be signed by John S. Green. We must presume that these signatures are genuine, as they were open to inspection, and have not been contested. Assuming that they are genuine, the inference is irresistible, that they evidence real transactions, not only because they correspond with the testimony of the witnesses, but because there could have been no necessity for their fabrication, so many years in advance of any supposed necessity for their production, John S. Green having died eight years before this bill was filed. Nor indeed, was their production at any time necessary, as the legal inference would have been, that they were destroyed, and the supposition that they were fabricated, imputes if possible more folly, than guilt to the supposed actors in it. They must doubtless be considered as genuine papers, and though they are proof which could not have been demanded, when produced they are strong confirmation of the fact of the indebtedness of John S. to Joseph A. Green; as no one can be presumed to execute notes for the payment of money, extending over a series of years, without any assignable motive, who is not really indebted. But independent of this presumption, arising from the notes themselves, the indebtedness of John to Joseph is fully proved.

To repel this proof, it is insisted there are various facts proved, establishing the fraudulent character of the sale. As that the slaves were brought away in the night, and traveled an unusual road to Alabama—that John S. Green came to this State about the same time, and resided near the slaves —that it was a sale of all the slaves of the vendor, leaving none for the performance of the menial offices of the family —that he occasionally exercised control over the slaves, after the sale—and that finally, the slaves went back to the possession of his family. These are doubtless signs, or badges

of fraud, and unexplained, would justify, and indeed, require the court to infer, that the sale was merely colorable. But when it is shown that a full and fair price was paid for the slaves, and possession delivered, and retained for more than six years, the explanation is full and complete.

Badges or signs of fraud, are inferences drawn by experience, from the customary conduct of mankind, which is in general marked by selfishness, and distrust of his fellows. The law therefore acting upon these known principles of human action, will not, against creditors, presume a gift to be made from motives of pure benevolence, but will rather presume a secret, and less worthy motive for the act; and in favor of creditors requires its purity to be established by satisfactory proof. But when the party shows the property to be his own, and that he has the right to do with it as he pleases, the inference is at once repelled. The utmost that the creditor could ask, would be, that the proof of the consideration should be more stringent, than would be demanded where no suspicion of unfairness existed.

Here the proof is ample to meet the demands of such a case, and were it much less convincing and satisfactory than it is, would be sufficient, when as here, the creditor has slept upon his rights for fifteen years and upwards. During this long interval of time, many facts must have become impossible of proof, from the death of witnesses, as is shown to be the case here, and even as to living witnesses, much must have faded from the memory, and passed into oblivion.

It is certainly a possible case, that a sale may be fraudulent, though a full price is paid for the property, if the intention of the parties was to defraud creditors. But here it is not shown, that Joseph A. Green knew of the insolvent condition of his brother; he denies all such knowledge. His brother William, who lived near John, deposes that he did not know it, and it certainly would be a rash presumption, that Joseph was better acquainted with his condition, being sixty miles from him. If, however, he did know the fact, he had the right to purchase the property to save his own debt, and no inference could arise that he intended to defraud others, and not to secure himself. To make such a purchase fraud-

ulent, the proof must be clear and convincing, that such was the purpose and intent of the act.

Nothing need be said here, as to the land alledged to have been purchased with the money of John S. Green, as the proof is ample to show, that the land was not purchased with his means, but by his friends for the benefit of his family.

It is further urged, that this contract was void at the time it was made from a law of the State of Georgia, then in force, to be found in Prince's Dig. 164.

The act is as follows: "Whereas a practice of selecting particular creditors by assignments and transfers of property, made by persons indebted, and thereby excluding or defrauding other *bona fide* creditors of their just claims on the estate of insolvent debtors, is contrary to the first principles of equity and justice. To prevent the mischief thereof, be it enacted, &c. that any person or persons unable to pay his or their debts, who shall at any time hereafter, make any assignment or transfer of real or personal property, stock in trade, debts, dues or demands, in trust to any person or persons, in satisfaction or payment of any debt or demand, or in part thereof, for the use and benefit of his, her, or their creditor or creditors, or for the use and benefit of any other person or persons, by which any creditor of the said debtor shall or may be excluded from an equal share or portion of the estate so assigned or transferred, such assignment, transfer, deed, or conveyance, shall be null and void, and considered in law and equity as fraudulent against creditors: provided, nevertheless, that nothing contained in this act shall prevent any person or persons in debt from *bona fide* and absolutely selling and disposing of a part or the whole of his, her or their real and personal estate, so the same be free from any trust for the benefit of the seller, or any person or persons appointed by him, her or them."

We think the clear intention of the legislature in ths act was, to break down the practice of giving preferences to certain creditors by deeds of assignment, and to compel debtors making assignments in trust, to place all their creditors on the same footing. This is clearly manifest in the preamble, which sets forth the mischief intended to be prevented, and there is nothing in the body of the act hostile to this declared

purpose. The act in the outset speaks of conveyances in *trust* for the payment of debts, and to this term all the specific conveyances afterwards enumerated must be referred. The proviso, excluding from the operation of the act absolute sales of property made *bona fide* by persons indebted at the time, was doubtless added out of abundant caution, as without it, such must have been the interpretation put upon the law. Otherwise, the act would have withdrawn from commerce the entire property of all persons indebted in the State, which certainly the legislature did not intend, as it would have put an end to all trade. Under this law, a debtor, although unable to pay all his debts, may make an absolute sale of the whole or a part of his property to a creditor, in payment of his debt, provided it is *bona fide;* and if fraudulent, it could be set aside at common law, as well as under this statute. The mischief to be guarded against, was not a payment of one creditor, to the exclusion of others, by an actual *bona fide* sale, for of this as a generally prevailing evil, little danger could be apprehended any where. It was to break up the practice of preferring one creditor to another by a trust, the evils of which have been felt in other countries, as well as Georgia; and as there is nothing impugning the *bona fides* of the sale, we must hold it valid under this statute.

The constitutional provision of the State of Georgia, article 1, § 14, states that no law shall be valid, which contains any matter not expressed in the title, has no application here. This proviso is not the enactment of a law in the sense of the constitution, but is entirely negative in its character, excluding a conclusion from the law which was passed. If the proviso were stricken from the law, it would not vary its legal effect, as the construction would be the same without it as with it.

It is also supposed that John S. Green took an interest under the deed of 1835, which may be subjected to the payment of his debts. The conveyance is of land and slaves to him in trust for the use of his wife, and children then in existence, or afterwards to be born. Upon the arrival at age, or marriage of any of the children, the slaves were to be divided between the wife and children, and he was appointed a

trustee, with authority to manage the property for the benefit of the *family*, subject to the limitations of the deed.

As there is nothing in the deed from which it can be inferred it was the intention of the donor to create a separate estate in the wife, the marital rights of the husband attached to whatever interest she had in the slaves. If the legal estate had been vested in the wife, upon its being reduced into possession by the husband, the interest of the wife would have been subject to the payment of his debts. But the estate of the wife being equitable merely, it could only have been made subject to his debts by a proceeding in chancery; and in that court the husband, or a creditor representing him, conceding he had the right to do so, would have been required to make a settlement upon the wife. [Inge v. Forrester, 6 Ala. 418.]

Carleton & Co. v. Banks, 7 Ala. 32, establishes the principle, that after the husband has reduced to possession a chattel, in which the wife had only an equitable title, the interest of the wife might be sold by the creditors of the husband. That was the case of a life estate in a slave, the title to which was in a trustee, with a remainder over after the death of the tenant for life. The possession was yielded by the trustee to the husband, who thereby became invested with the right to the possession during the life of his wife. In this case, there was no such reduction into possession by the husband. He received the possession under the deed, "strictly in trust" for the use of his wife and children, and until the quality of his possession is changed by some act demonstrating his intention to assert his marital rights over the property, his possession will be referred to the deed under which he obtained it. An assignment of his interest for a valuable consideration, would be regarded by a court of equity as a reduction into possession, or he might have applied to a court of chancery for that purpose, but until he manifests his intention of assuming his marital rights, his possession must be considered that of a trustee for his wife and children. [Honner v. Morton, 3 Russ. 68; Johnson v. Johnson, 1 Jac. & W. 450; Kenny v. Udall, 5 Johns. Ch. 473; Elliott v. Cordell, 5 Madd. 150; Andrews v. Jones and

Spears v. Walkley, 10 Ala. 328; see also Fellowes, Wadsworth & Co. v. Tann, 9 Ala. 1002.]

Whether the creditors could have asserted the right of the husband during his life, is a question not presented on the record. By his death it is clear the right survived to the wife.

This disposes of the entire case, and renders it improper to consider the other questions raised at the bar.

Decree affirmed.